Danny Atterbury
2100 Napa Vallejo Hwy.
Napa, CA 94558
In pro per



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| DANNY ATTERBURY | No. CV 07 6256 MHP (PR) |
|---|---|
| Plaintiff, | REQUEST LEAVE TO AMEND COMPLAINT TO CURE DEFICIENCIES AND REASONABLE TIME WITHIN WHICH TO DO SO, REQUEST LEAVE TO FILE MOTION FOR COURT TO RECONSIDER DISMISSED CLAIMS (Civil L.R. 7-9 (a)-(b)), AND REQUEST FOR COURT TO HOLD CASE EXEMPT FROM PRISON LITIGATION REFORM ACT (PLRA). |
| v. | |
| ED FOULK; et al., | |
| Defendants. | |

### AMENDMENTS

Under well established Ninth Circuit precedent, Rule 15(a), of the Federal Rules Civil Procedure requires that even where amendment is not a matter of right, leave to amend shall "be freely granted when justice so requires." The fact that a plaintiff does not present his or her request to amend the complaint in a separate formal motion is not a bar. As the Ninth Circuit held in *Scott v. Eversole Mortuary*, 522 F.2d 1110 (9th Cir.1975), Rule 15(a) applies where plaintiffs "expressly requested" to amend even though their request "was not contained in a properly captioned motion paper." (Id. 1116 n. 8. See also *Edwards v. Occidental Chemical Corp.*, 892 F.2d 1442, 1445 n. 2 (9th Cir.1990) (request for leave to amend should have been granted even though request appeared in opposition to motion for summary judgment and was not formally tendered). The standard for granting leave to amend is generous, and in *Scott v. Eversole Mortuary*, 522 F.2d at 1116 the Ninth Circuit reversed a district court's dismissal of a plaintiff's count insofar as the district court denied leave to amend because the Ninth Circuit

1

could "conceive of facts" that would render plaintiff's claim viable and could "discern from the record no reason why leave to amend should be denied." Similarly, in *Breier v. Northern California Bowling Proprietors' Ass'n*, 316 F.2d 787, 789-90 (9th Cir.1963) the Ninth Circuit held that leave to amend should be granted if underlying facts provide proper grounds for relief or if the complaint can be saved by amendment. "[L]eave to amend should be granted 'if it appears at all possible that the plaintiff can correct the defect.' " Id. at 790 (quoting *3 Moore, Federal Practice*, § 15.10 at 838 (2d ed. 1948)). (See *Balistreri v. Pacifica Police Department* (9th Cir, 1990) 901 F.2d 696, 701.)

The Ninth Circuit Court of Appeals "has noted on several occasions ... that the United States Supreme Court has instructed the lower federal courts to heed carefully the command of Rule 15(a), Fed. R.Civ.P., by freely granting leave to amend when justice so requires." (*Gabrielson v. Montgomery Ward & Co.*, 785 F.2d 762, 765 (9th Cir.1986), quoting *Howey v. United States*, 481 F.2d 1187, 1190 (9th Cir.1973.) The Rule 15 policy of favoring amendments to pleadings should be applied with "extreme liberality." (*United States v. Webb*, 655 F.2d 977, 979 (9th Cir.1981), citing *Rosenberg Brothers & Co. v. Arnold*, 283 F.2d 406 (9th Cir.1960) (per curiam)). The policy is applied even more liberally to pro se litigants, and in *Armstrong v. Rushing*, 352 F.2d 836 (9th Cir.1965), the Ninth Circuit established that a pro se litigant bringing a civil rights suit must have an opportunity to amend the complaint to overcome deficiencies unless it is clear that they cannot be overcome by amendment. (352 F.2d at 837) (pro se litigant entitled to procedural protections, including right to amend complaint unless futile); see *Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir.1987); *Potter v. McCall*, 433 F.2d 1087, 1088 (9th Cir.1970) (per curiam). The Court in *Eldridge v. Block* pointed out that Courts, in fact, "provide a pro se litigant with notice of the deficiencies in his or her complaint" to ensure that the litigant uses the opportunity to amend effectively." (*Noll v. Carlson*, 809 F.2d 1446, 1448 (9th Cir.1987). While a statement of deficiencies need not provide great detail or require district courts to act as legal advisors to pro se plaintiffs, district courts must at least draft a few sentences explaining the deficiencies. (*Noll*, 809 F.2d at 1448-49.) Moreover, "strict time limits ... ought not to be insisted upon" where restraints resulting from a pro se prisoner plaintiff's incarceration prevent timely compliance with court deadlines. (*Tarantino v. Eggers*, 380 F.2d 465, 468 (9th Cir.1967); see *Veit v. Heckler*, 746 F.2d 508, 512 (9th Cir.1984) (holding that extension of time was proper where evidence established just cause). Reliance upon time limits

can in fact aggravate the court's failure to appraise a plaintiff of deficiencies. (*Eldridge v. Block* 832 F.2d 1132, 1136 (9th Cir. 1987.)

**CLAIMS AT ISSUE FOR RECONSIDERATION**

**I**

Plaintiff Danny Atterbury (hereinafter "I") requests the Court to grant me leave to file a motion for reconsideration of the Court's dismissal of my claim that Defendant Katie Cooper [and her Ward T-4 Unit Supervisor Jerry Wright] confiscated and retained most of my personal property, legal materials, files, and records on April 23, 2007 (which contravenes Napa State Hospital Administrative Directive (AD) #786 (*cf. Bell v. Johnson* 308 F.3d 594, 599 (6th Cir. 2002), when they transferred me from Ward T-4 to the much more violent and extremely lower functioning punishment and deprivation Ward T-7, and the Court did not permit me to amend the deficiency.

The standard forms for filing a lawsuit pursuant to Title 42 U.S.C. § 1983 do not provide much space to explain the claim in a short and plain statement and pro se plaintiffs get faulted when their complaints are eventually served and the claims are often dismissed for plaintiffs not adequately explaining their claims in the forms.

I was not granted full or reasonable access to all of my legal materials from April 23, 2007, when Defendant Katie Cooper [and Jerry Wright] transferred me to the violent Ward T-7 without any due process or equal protection of laws and without any legitimate penological justification until the beginning of April 2008, when I persuaded the Ward T-7 Unit Supervisor Demetrius Henderson to bring several boxes of my legal materials to Ward T-7, Room #724, where I resided and permitted me to sort out my legal materials and ascertain if anything was missing from my legal materials when they were confiscated and retained on April 23, 2007.

However, on April 17, 2008, Defendant Mike Stolp's subordinates psychiatric technician Dawn Simon and psychiatric technician Virgil Waller Junior arranged for psychiatric technicians from Ward Q-3&4 to come to Ward T-7, and rifle through my personal property storage locker and my living areas, and conduct a search and seizure before I had finished sorting through the legal materials originally confiscated on April 23, 2007, to ascertain if any materials were missing.

At about 8:00 AM on April 17, 2008, Virgil Waller started going from door to door and yelling there was an emergency and all the patients must exit the building for their own safety. Virgil then herded all the patients, including me, into the Ward T-7 Courtyard and we were made



to stay there for a couple of hours as psychiatric technicians from Ward Q-3&4 [ostensibly] searched through the patients' rooms. Demetrius Henderson came to the Courtyard at about 9:30 AM and I told him that I have the right under AD #786 and Title 9, California Code of Regulations, § 883(b)(1) to observe staff searching my room and they are not supposed to take anything without making a list and giving me a receipt. Demetrius Henderson refused to let me observe the search and said that he would personally search my room and have Ward Government patient representative Tim Gillman observe him search my living areas and locker.

I saw Tim Gillman some time later and Tim said that Demetrius did not take anything and did not make a mess. However, the patients, including me, were all shuffled from the Ward T-7 Courtyard after a few hours to the Yosemite Room and then to the Yosemite Room Courtyard and when I was finally permitted to return to Room # 724 in tremendous pain from my spinal injury and the activity, I learned my locker was empty, all of my property and legal materials had been confiscated and everything was a mess and it took me several days to sort out what was left intact and not lost, destroyed, and confiscated.

My external hard disk drive was on my bed and my computer was plugged into the wall, although I had deliberately unplugged my computer from the wall when Virgil had gone through the rooms that morning driving the patients, including me, out of our rooms and into the courtyard. I demanded to have a copy of the list of my legal materials and other property confiscated and I cited AD #786 in support of my demands. I was told no one made a list and I could have some of my property and legal materials back the next day.

I told Demetrius he and his compatriots flagrantly violated AD # 786 during the April 17, 2008, search and seizure just like they did on April 23, 2007, and I need a few days with all my legal materials and all my other property in my room with me to enable me to finally sort through all my legal materials and property after the same was kept out of my sight and out of my possession in a room in another part of the building for one-year, and ascertain what is missing. I was permitted to sort through all my legal materials and property in my room over the weekend and I learned that copies of evidence I mailed to the United States District Court, Eastern District of California, in 2003 for case Number 03-CV-1809-GEB-DAD-P, that counsel currently needs to prepare my federal appeal before the United States Ninth Circuit Court of Appeals, Case Number 08-15162, is all missing and so are many other documents and important pieces of evidence and exhibits missing.

4



Counsel on appeal Number 08-15162 came to NSH and I provided her with the evidence of my claims I still had in my possession after the April 17, 2008, search and seizure and I explained that I mailed CCHR Advocate and Investigator Mr. William Sargent copies of most of the evidence years go and the Third District Court of Appeals in Sacramento, the California Supreme Court, and the U.S. District Court in Sacramento retains the evidence in their archives. Counsel submitted a request to the Ninth Circuit Court of Appeals for an extension of time to obtain copies of the records misappropriated and confiscated either during the unconstitutional transfer on April 23, 2007, or during the unconstitutional search and seizure on April 17, 2008, in order to file the opening brief for appeal Number 08-15162. I know other records are missing but I have not yet realized the full extent of the loss and damage or actual injury caused by the unlawful and retaliatory actions during the transfer on April 23, 2007, subsequent retention, and during the search and seizure on April 17, 2008, and I will only realize the full extent of the loss and damage or actual injury a little at a time as remember and look for documents I need but then realize are missing.

## II

I request the Court to grant me leave to file a motion for reconsideration of my First Amendment claim that the government may not force any person to accept, adhere to, or financially support any ideology, religion, or any body of beliefs, including psychiatric or psychological beliefs or ideologies, and the Court did not give me the opportunity to amend and correct the deficiency. The Court responded to this claim by stating in pertinent part that "The facts alleged – that hospital officials reportedly might take steps to try to encourage patients to participate in psychiatric and psychological programs - do not amount to an infringement on plaintiff's First Amendment rights. The claim is dismissed."

I did not claim that "hospital officials reportedly might take steps to try to encourage patients to participate in psychiatric and psychological programs," but what I stated in the complaint is that "Mike Hansen wrote a letter to try to help me and in the letter he mentions that the staff are planning to lock the patients out of their rooms all day any and into the hallway, and this is a coercive method to force the patients to attend the groups and accept their psychiatric and psychological ideology." Locking patients out of their rooms into a hallway for hours to force them to participate in groups they do not like, do not benefit from, and do not believe in does not "encourage patients to participate in psychiatric and psychological programs." No matter how anyone tries to sugarcoat the defendants' act of locking mental patients into a

5

hallway for hours as a means to force them to do something they do not want to do, the act remains tantamount to coercion and corporal punishment.

In fact, the Citizens Commission on Human Rights[1] calls this type of "treatment" "psychological rape," and this is all for naught because there is not effective or legitimate cure for mental unless. In 1994, psychiatrist Norman Sartorius (president of the World Psychiatric Association (1996-1999) declared at a meeting of a congress of the Association of European Psychiatrists, "the time when psychiatrists considered that they could cure the mentally ill is gone. In the future the mentally ill have to learn to live with their illness." (Lars Boegeskov, "Mentally Ill Have to Have Help—Not to be Cured," *Politiken* 19 Sept. 1994.) The following year, after more than $6 billion (€4.9 billion) in taxpayer money had been poured into psychiatric research, psychiatrist Rex Cowdry (Director of the U.S. National Institute of Mental Health) agreed with the WPA Chief and stated "We do not know the causes [of mental illness]. We don't have the methods of 'curing' these illnesses yet." (Declaration of Psychiatrist Norman Sartorius (president of the World Psychiatric Association (1996-1999) before congress of the Association of European Psychiatrists, Lars Boegeskov, "Mentally Ill Have to Have Help—Not to be Cured," *Politiken* 19 Sept. 1994.) Testimony given by Dr. Rex William Cowdry, Acting Director of the National Institute of Mental Health before a Subcommittee of the Committee on Appropriations, House of Representatives, 104th Congress, First Session, "Part 4, National Institutes of Health," section on the National Institute of Mental Health, Washington, D.C., 22 Mar. 1995, p. 1205.)

The California Supreme Court has characterized mental institutions as "sanitary dungeons" and parts and aspects of Napa State Hospital can be characterized as a "not so sanitary dungeon." I do not have the modern conveniences of an office and I feel blessed to even be able to write what I can. The institution was so out of line with the outside world that U.S. Postage stamps were not even sold here until I complained to licensing. My section 1983

---

[1] The Citizens Commission on Human Rights (CCHR) International was established in 1969 by the Church of Scientology to investigate and expose psychiatric violations of human rights, and to clean up the field of mental healing. Today, it is estimated that CCHR has more than 250 chapters in over 31 countries. Its board of advisors, called Commissioners, includes doctors, lawyers, educators, artists, business professionals, and civil and human rights representatives. CCHR has inspired and caused many hundreds of reforms by testifying before legislative hearings and conducting public hearings into psychiatric abuse, as well as working with media, law enforcement, and public officials the world over. (CCHR: www.cchr.org • www.psychdrugsdangers.com • e-mail: humanrights@cchr.org. www.psychcrime.org • http://www.dodig.osd.mil/INV/DCIS) (CCHR: Tele: (323) 467-4242 • (800) 869-2247 • (800) 942-2247 • see also Bill Sargent, Shasta County at (530) 472-3299 • e-mail-cchr@jett.net • e-mail-sarge@jett.net)

6

complaint was limited by what the standard form for filing a Title 42 U.S.C. § 1983 lawsuit permitted, with the screams and howls of mental patients and the staff yelling orders and threats over the loudspeaker as I completed the form. I sent Mike Hansen's letter as an exhibit, but was not able to send a copy of the notice dated December 4, 2007, that NHS Clinical Director, Carmen Caruso, had posted on the wall of Ward T-7 on January 23, 2008, and even if I could get everything else together there is no guarantee NSH would forward my mail to the court.

Carmen Caruso's notice essentially orders the staff to lock patients out of their rooms to force them to attend groups and the notice mentions the Introduction to the Court monitor Report #3, that is dated July, 2007.[1] I called Bill Sargent and other advisors and I was told to look at the disclaimer note the Court monitor wrote at the beginning of the "REPORT 3, July 23-27, 2007." The May 2, 2006, consent judgment monitor includes a disclaimer note at the beginning of all his reports on the lack of progress being made at NSH, and the disclaimer states verbatim "the Court Monitor is responsible only for monitoring and providing an independent evaluation of Napa State Hospital's compliance with the Enhancement Plan. The Court Monitor is not in any way responsible for the services provided at Napa State Hospital or for outcomes of these services for any individual resident at the facility during or following the tenure of the Enhancement Plan. Neither the Court Monitor nor his experts are in any way responsible for the administration of the facility, the day-to-day clinical management of the individuals served clinical outcomes for any individual, staffing, outcomes for staff providing services at the facility or any other aspect of the operations of Napa State Hospital. All decisions regarding the facility, its clinical and administrative operations and the individuals it serves are made independently from the Court Monitor."

I was told the monitor knows that it is unconstitutional, coercive, and abusive to lock patients out of their rooms into a hall and force them to participate in unscientific groups and ideologies and that it is inhumane to lock patients with medical problems out of their rooms because they need to lie down and the US Justice Department would not allow the monitor to go

---

[1] The complaint at p. 4 mentions the two CRIPA (Civil Rights of Institutionalized Persons Act) Investigations the U.S. Justice Department (USDOJ) conducted at NSH during the past decade. Napa is not truthful and in a 24 page letter to Governor Arnold Schwarzenegger on June 27, 2005, the USDOJ noted as "a threshold matter, State officials have declined to cooperate with this investigation. In particular, they repeatedly have refused to allow the Department access to the facility, most recently stating that access will not be provided before sometime in 2006." (The USDOJ sued Napa in 1990 and again in 2006, under Title 42 U.S.C. § 1997, due to the egregious conditions they found during both the investigations. (See www.usdoj.gov; complaint C 90 2641 EFL, filed September 13, 1990, U.S. District Court, Northern District of California, and see complaint CV 06-2667 GPS and 92-page consent judgment filed Tuesday, May 2, 2006, U.S. District Court, Central District of California, Western Division.)

out on a limb like that and I allege NSH is misquoting and misrepresenting the Court monitor.

I was advised that Carmen Caruso and her cronies got the idea of locking patients out of their rooms to force them to listen to their ideologies when they noticed page 332 of the Court Monitor "REPORT 3, July 23-27, 2007," which states verbatim "Recommendation 2, February 2007: Initiate interventions in the WRP to integrate bed-bound individuals into milieu activities both in and out of their rooms," and are intentionally twisting the intent of this sentence to meet their own goals of forcing other people to attend their groups.

This is unconstitutional pursuant to Title 9, California Code of Regulations, § 883(b), Non-LPS Patients have the following rights: (1) A right to privacy, dignity, respect and humane care. (2) A right to receive treatment for a diagnosed mental disorder that is provided in a method least restrictive of individual liberty and promotes personal independence, and Carmen Caruso has no legitimate authority to direct staff to lock patients out of their rooms to force them to listen to the unscientific psychiatric and psychological ideologies, and this is prohibited by the First Amendment to the U.S. and Constitution and like provisions in the California Constitution.

The Court correctly assumes at p. 2 order of service that I do not want to participate in the pseudo science of psychiatry and psychology because I do not believe there is a legitimate scientific basis for psychiatry and psychology. CCHR and Bill Sargent educated me that there is not any legitimate scientific basis to the pseudo scientific industries of psychiatry and psychology, there are not any blood or other biological tests or scans that can legitimately ascertain the presence or absence of mental illness or a "chemical imbalance," and there is not any legitimate or effective cure for mental illness. (See www.psychdrugsdangers.com • www.cchr.org • e-mail: humanrights@cchr.org.)

It is true that many people have faith in the industries of psychiatry and psychology, but the evidence of the fraud is abundant and apparent and I find it much easier to have faith in history and the Bible, rather than something created by men and easily proven spurious. Many courts have repeated Thomas Jefferson's view that "to compel a man [or woman] to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical." (Brant, James Madison: The Nationalist (1948) p. 354, as quoted in Abood v. Detroit Board of Education (1977) 431 U.S. 209, 235, fn. 31.)

///

///

## III

I request the Court to grant me leave to file a motion to reconsider my claim that I have made several requests to Defendant Ed Foulk to move me to a safer ward and a ward where I can take it easy with my spinal injury, but he will not move me, and consider the disability and the terrible pain I have been subjected to for over one-year as a result of the transfer and the distance I have to walk to get to any of the activities, including the law library, due to Ward T-7 being located at the utmost part of the institution from all the activities.

## IV

I request the Court to grant me leave to file a motion to reconsider my claim that depriving me of rights, privileges, amenities, and a calm environment, which all the other patients in the institution benefit from and enjoy, is a constitutional violation. I finally had an Open MRI of my lower spine on July 2, 2008 at the Queen of the Valley Hospital Imaging Center in Napa California. The first page of the results reads in pertinent part "[t]here is a central compression fracture of the L3 vertebral body with approximately 30-40% loss in height. The fracture is remote in age based on the "rr arrow" [sic] signal intensities." (Emphasis mine.) The conclusion to the results on page 2 states the MRI revealed (1) "multi-level degenerative disc disease with lateral disc protrusions at L3-4 and L4-5 resulting in neural formaminal stenosis," and (2) "chronic (remote) L3 vertebral body compression fracture."

I guarantee that anyone 60 years old that has gone through the disability and intense pain from an injury to the spine like this and thrust into an atmosphere where they are forced to contend with much younger and physically strong violent and insane mental patients screaming, arguing, and physically fighting all day on a daily basis and more, in retaliation for exercising my first amendment right to complain, would differ and this is a constitutional violation. Furthermore, the defendants labeling me too irresponsible to handle my own money and depriving me of my cash money ($50.00 per week) just because I was transferred to Ward T-7, although I held my own money for 19 years without any problem, and all the other patients in the institution, except Ward T-7 patients, are permitted to handle their own money are valid and cognizable First, Eighth, and Fourteenth Amendment claims. It is also much more difficult and time consuming to purchase merchandise at the canteen or purchase a soda or candy from the machines without cash money, this is demeaning, and violates Title 9, California Code of Regulations, § 883(b)(1) and my constitutional rights to equal treatment, inter alia.

In addition to all this, the water at NSH tastes very badly, is unsanitary on Ward T-7, and I have never seen any of the staff drink the water during the entire 20 years I have been confined, the water fountain drain is frequently plugged and filled with foul water, sputum, and other vile things, and all the other wards have a soda and candy machine and this is unfair and punishment and this commitment is not supposed to be punishment. NSH received $180,264.00, tax money for the "cost of care" for each individual confined at NSH in 2007 alone and the cost increases every year and NSH is defrauding the taxpayers, the courts, and the mental patients. (See enclosed chart with budget report.)

Moreover, persons that are committed to mental hospitals are supposed to receive "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish" (*Sharp vs. Weston*, 233 F. 3d 1166, 1172 (9th Cir. 2000), quoting *Youngberg v. Romeo* (1982) 457 U.S. 307 at 322, 102 S.Ct. 2452; Cf. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976, and mentally disordered persons—regardless of their path to the institution—should be regarded as patients rather than inmates in institutions. (*Department of Developmental Services v Ladd* (1990) 224 Cal.App. 3d 128, 137-138.) Furthermore, according to California Welfare and Institutions Code, § 6250, mentally disordered persons charged with crime or to the criminally insane subject to judicial commitment shall be treated, not as criminals, but as sick persons.

## V

I request the Court to grant me leave to file a motion to reconsider my First Amendment claim that hospital officials deprive patients of rights, privileges, and immunities if they refuse to accept or attend the pseudo scientific teachings of psychiatry and psychology. The complaint was filed months ago and hospital officials did not end up locking me out of my room due to the spinal injury but I am prohibited from leaving the locked building Monday through Friday until 11:30 AM because groups are being held. All the patients on other wards in the institution are permitted to go outside on grounds in the mornings and go to the canteen to eat or enjoy the fresh morning air seven days a week, except patients on Ward T-7, and this is unequal treatment in retaliation for my beliefs against psychiatric ideologies and violates my constitutional rights.

### THE PLRA

"It is beyond dispute that the primary purpose of the PLRA, and the exhaustion provisions in particular, was to reduce the inordinately large volume of '*prisoner cases*' being filed in the federal courts." (Emphasis mine.) (*Blas v. Endicott* (1999) 31 F.Supp.2d 1131, 1133)

*Blas v. Endicott* certainly does not attribute enactment of the PLRA to overindulgences by mental patients and it is easy to prove that mental patients are getting a "bum rap" with the PLRA yoke tied around their necks, in addition to having to overcome the Stigma of Mental Illness and the paternalistic attitudes they encounter when trying to defend their rights in court. (Conservatorship of Roulet (1979) 23 Cal.3d 219, page 229, 234-235.) A simple keyword search in any good legal database using the words "mental," "mental illness," "insanity," in any combination or individually will quickly show that the number of cases filed in the federal courts by mental patients during the past 100 years is diminutive, and the few complaints I found that were filed by mental patients were summarily and quickly disposed of soon after filing.

The Court in *Gilmore v. California* stated the PLRA's sponsors decried "overzealous Federal courts ... micromanaging our Nation's prisons," and "judicial orders entered under Federal law that have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts." (remarks of Sen. Abraham). The *Gilmore v. California* Court continued that "[f]rom these and other pronouncements, it is clear that Congress intended the PLRA to revive the hands-off doctrine. (See *Gilmore v. California,* 220 F.3d 987, 997 (9th Cir. 2000) (However, see *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (The Supreme Court emphasized that a document filed pro se should be construed even more liberally, "however inartfully pleaded.")

I am a nobody being held unconstitutionally and virtually incommunicado in a mental institution and society does not count my opinion for much, but I disagree with the part above about "overzealous Federal courts ... micromanaging our Nation's prisons," and "judicial orders entered under Federal law that have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts," but I know how it feels to be sorely abused at every turn and have all your rights ignored by custodians that been corrupted by power or just do not care. I also know how it feels to be ignored, neglected, and my credibility discredited by elected officials accountable to the taxpayer that are too busy to care and deceived by the custodians committing the abuse. If the federal courts take a "hands off doctrine" and do not examine complaints of serious abuse in prisons and mental institutions, then who will? I do not know of any elected officials in history that went on a crusade for prisoner's rights or the rights of the mentally ill, and with all due respect I think that perhaps the PLRA's sponsors and Sen. Abraham spoke when they should have abstained.

The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." (*LaFontant v. I.N.S.*, 135 F.3d 158, 165 (D.C. Cir. 1998) The Northern District of California Court that heard *Grondorf v. Grazaini*, C 03-4230 SI (PR) (2004), ruled that "Grondorf's confinement following a not-guilty-by-reason-of-insanity determination *appears* to make him a prisoner for purposes of 28 U.S.C. §§ 1915 and 1915A," and in support of that proposition the Grondorf Court cited *In re Franklin*, 7 Cal.3d 126, 138, 143-144 (Cal.1972). (Class of persons committed to a state mental hospital following finding of not guilty by reason of insanity was different from class of persons subjected to ordinary civil commitment proceedings). (Italics mine.)

Notwithstanding, the Court in *People v. Buttes* explained that a person who has been acquitted by reason of insanity is found not guilty of committing the crime and cannot be punished by incarceration in prison (Pen. Code, § 1026). The *People v. Buttes* Court continued explaining that the California Supreme Court in *In re Franklin* 7 Cal.3d 126, 141-142 (1972), recognized this difference when quoting from *Bolton v. Harris* (D.C. Cir. 1968) 395 F.2d 642, 651. The Franklin court stated: "it is significant that the court in *Bolton* acknowledged governmental authority to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant differences between these two groups ...."

It is noteworthy that the Grondorf Court stated *In re Franklin* "*appears*" to make him a prisoner for purposes of 28 U.S.C. §§ 1915 and 1915A," but a closer examination reveals that the *In re Franklin* Court was illustrating a completely different point and was not referring to any principles contained in or related to the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, which was enacted on April 26, 1996, which is 24 years after *In re Franklin* was decided.

The *In re Franklin* Court stated, "it is significant that the court in *Bolton* (*Bolton v. Harris*, 395 F.2d 642 (D.C. Cir 1968) acknowledged governmental authority 'to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant differences between these two groups.'" (*In re Franklin* (1972) 7 Cal.3d 126, at 142.) But it appears to me that the *In re Franklin* Court was discussing commitment standards and hearings and not referring to anything else.

It is difficult for a pro se litigant to square the United States Supreme Court decision in *Erickson v. Pardus* with the PLRA. That is, the PLRA seems to suggest or require the opposite



12/21/2007         09:09         7072535411         NSH ED

NAPA STATE HOSPITAL
COST OF CARE PER FISCAL YEAR FOR EACH INDIVIDUAL

| Fiscal Year | Allocation Amount | Population | Cost per Individual |
|---|---|---|---|
| 2006/07 | $211,810,383 | 1,175 | $180,264.00 |
| 2005/06 | $191,399,492 | 1,157 | $165,427.00 |
| 2004/05 | $176,684,826 | 1,157 | $152,709.00 |
| 2003/04 | $162,793,625 | 1,044 | $155,933.00 |
| 2002/03 | $150,817,564 | 1,064 | $141,746.00 |
| 2001/02 | $151,126,365 | 1,092 | $138,394.00 |

Cost Per Meal

| Food cost FY 06/07 | $2,298,544.02 |
|---|---|
| Food cost per day | $6,297.38 |
| Food cost per patient per day | $5.24 |
| Food cost per meal per patient per day | $1.74 |



Public Information





NSH Mailroom, please send me Outgoing legal Mail Receipt.

**Legal Mail**
Mailed on 14-Jul-08

Danny Atterbury
2100 Napa Vallejo Hwy.
Napa, CA 94558

NSH Mailroom, please stamp legal mail to Federal Court for $12.50 Client.

Office of the Clerk
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, California, 94102



Program 1 Office and NSH Mailroom:
Please ensure this Envelope is mailed today (14-Jul-08) because I have a time limit just like the petitioner in the





$01.68
JUL 15 20
MAILED FROM ZIP CODE 945
02 1M
0004219468
UNITED STATES POSTAGE
PITNEY BOWES

Danny Atterbury
2100 Napa Vallejo Hwy.
Napa, CA 94558

**Legal Mail**
Mailed on 14-Jul-08

NSH Mailroom, please stamp legal mail to Federal Court for $12.50 Client.

Office of the Clerk
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, California, 94102

Program 1 Office and NSH Mailroom:
Please ensure this Envelope is mailed today (14-Jul-08) because I have a time limit just like the petitioner in the California Supreme Court case of *In re Jordan* (1992) 4 Cal.4th 116, had a time limit to mail his legal mail to a Court.




$01.58
02 1M
0004219468   JUL 15 2008
MAILED FROM ZIPCODE 94558







