UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANNY ATTERBURY, | No. C 07-6256 MHP (pr) |
| Plaintiff, | **ORDER GRANTING SUMMARY JUDGMENT FOR DEFENDANTS** |
| v. | |
| ED FOULK; et al., | |
| Defendants. | |

## INTRODUCTION

In this pro se civil rights action under 42 U.S.C. § 1983, Danny Atterbury complains about the conditions of confinement at Napa State Hospital, where he previously was in custody. The matter is now before the court for consideration of defendants' motion for summary judgment. For the reasons discussed below, defendants are entitled to judgment as a matter of law in their favor.

## BACKGROUND

The court earlier found that Atterbury had stated a cognizable § 1983 claim against four employees at the Napa State Hospital ("NSH") for failing to protect him. Atterbury alleged that defendant Cooper put him in a ward with other dangerous people, defendant Gwen Livones exacerbated the danger by telling other dangerous patients that Atterbury's actions were the cause of the delay in their release to the smoking area one day, and defendants Foulk and Stolp refused to move him out of that dangerous ward after he complained about the danger and/or being attacked.

The following facts are undisputed unless otherwise noted:

The incidents that gave rise to the complaint occurred at NSH in 2007.

Danny Atterbury was a patient at NSH at the relevant time. He had been in custody at that hospital since his commitment in 1989 following a finding of not guilty by reason of insanity of two counts of attempted murder. See Complaint, p. 3. Atterbury was released from NSH on February 20, 2009.

There are four defendants. Ed Foulk was the executive director at NSH. M. Katie Cooper and Michael Stolp were program directors at NSH. Gwen Livones was first a psychiatric technician and then (starting in October 2007) a senior psychiatric technician at NSH.

Atterbury did not believe in psychiatry and psychology; consequently, he resisted efforts to treat him at NSH. Atterbury was guided by persons connected with the Citizens Commission on Human Rights International, an organization "established in 1969 by the Church of Scientology to investigate and expose psychiatric violations of human rights, and to clean up the field of mental healing." Amended Complaint, p. 2 n.1. He was educated by the Commission "that there is not any legitimate scientific basis to the pseudo scientific industries of psychiatry and psychology, there are not any blood or other biological tests or scans that can legitimately ascertan the presence or absence of mental illness or a 'chemical imbalance,' and there is not any legitimate cure for mental illness, so it is a waste of time to attend worthless groups." Complaint, p. 5.

Placement In Ward T-7: On or about April 23, 2007, Atterbury was transferred from Ward T-4, program 2 to Ward T-7, program 1. Defendants Cooper and Stolp participated in this transfer decision. Atterbury believed that Ward T-4 was a more agreeable place to be housed because it was calmer and less violent, and had more amenities than Ward T-7.

Atterbury stated in his complaint that his transfer was "in retaliation for my complaints and because I do not believe in psychiatry and psychology and I refuse to participate." Amend. Complaint, p. 1.

Defendant Cooper explained the reasons for the transfer:

In the staff's view, which I shared, the transfer was expected to best serve the

2

>psychiatric needs of Mr. Atterbury as well as the patients in Wards T-4 and T-7. In addition, the transfer was expected to enhance the safety and security of the patients and staff in those wards and in the hospital generally. Specifically, the patients in Ward T-7 were, on average, less susceptible than the patients in Ward T-4 to Mr. Atterbury's negative influence and anti-social behavior – and were therefore less prone to being agitated by Mr. Atterbury's racist, homophobic, and incendiary comments and actions – which, in turn, tempered Mr. Atterbury's own negative behavior.

Cooper Decl., ¶ 2; accord Stolp Decl., ¶ 2.

<u>Refusal Of Transfer Requests</u>: Atterbury requested and was refused a transfer out of Ward T-7. For the same reasons the staff decided to transfer Atterbury into the ward, the staff decided not to transfer him out of the ward. "In our professional opinion, the staff believed that Mr. Atterbury's ability to recruit and instigate other patients in other wards to follow his anti-social behavior would increase tension and potentially create unsafe situations in those wards. (The patients in Ward T-7 are, on average, lower functioning and therefore less susceptible to such recruitment.) Keeping Mr. Atterbury in Ward T-7 minimized that risk." Cooper Decl., ¶ 3; accord Stolp Decl., ¶ 6. Defendant Stolp explained that, based on his own observations and those of subordinates who reported to him, most of the patients in Ward T-7 "wanted nothing to do with Mr. Atterbury," and "[t]his dynamic created a safer environment for Mr. Atterbury and other patients because Mr. Atterbury was unable to recruit 'lieutenants' or other followers to support his anti-social behavior." Stolp Decl. ¶ 4.

Notwithstanding defendants' explanations in their motion for summary judgment, two defendants told Atterbury that different reasons had motivated their actions. Atterbury stated that defendant Cooper told him he was being transferred to Ward T-7 because he (Atterbury) wanted to be moved to an honor unit and had to be on Ward T-7 to wait for bed space to open on an honor unit. Complaint, p. 3. Atterbury explained to Cooper that he did not want to be on Ward T-7 because of his age and old spinal injury, Ward T-7 was more dangerous, and moving someone to that ward was not the procedure to get to an honor unit. Nonetheless, Cooper had Atterbury moved.

Defendant Foulk also gave Atterbury a different reason for the transfer. In a letter dated August 22, 2007, director Foulk wrote: "You were Administratively Transferred

3

because of mandatory program population adjustments. As it appears you were not involved in any treatment, your move would not result in disruption of treatment." Opposition, Exh. A (docket # 62). Atterbury does not dispute that he was not in any treatment program that would have been disrupted by the move.

Defendants dispute whether Ward T-7 can be characterized as a violent place, but do not challenge Atterbury's assertion that Ward T-7 was a less desirable place to live than Ward T-4. Defendants present evidence that they took steps to improve Ward T-7, however. It is undisputed that hospital staff implemented practices to reduce violence on Ward T-7 and make it a safer place. These practices included "administering medications, convening 'coping skills,' 'active treatment,' and other group therapy and anger management sessions, consulting with the Positive Behavioral Support Team, comprised of registered nurses, psychologists and psychiatric technicians, as a response team to anticipate problems and deal with them as they arise; and encouraging leisure activities (e.g., walking groups, games, etc.) to keep the patients engaged and active." Henderson Decl., ¶ 4. The staff also "separated patients who showed potential signs of conflict (e.g., changing room assignments, scheduling separate group sessions, etc.), and assigned hall monitors for each of the four halls to watch for any signs of potential conflict." Id.

Physical Contact With Another Patient: The parties disagree about some of the details of an incident on July 31, 2007, in which Atterbury was hit by another patient. Atterbury describes the incident: "I went to the Ward T-7 Office window to ask a question through the small slot in the window and [patient] Mark Tristman suddenly walked up and essentially pushed in front of me. Out of surprise I raised my hand between Mark and I and Mark reacted by punching me in the face very hard." Opposition, p. 2 (docket # 62.) Defendants, on the other hand, presented evidence that Atterbury had touched the other patient first, and that the other patient had reacted by slapping rather than punching Atterbury. Although they disagree with regard to these details, there is no dispute that Atterbury suffered no measurable injury as a result. Atterbury states that hospital staff refused to call the hospital police and refused to examine or photograph him, but he does not state that he suffered any

4

injury necessitating medical care. Defendants do not dispute that they did not call the police; however, the ward staff "took notes to record the interchange between [the other patient] and Mr. Atterbury, and an abuse report was filed, but the event did not rise to the level of a formal incident report."  Henderson Decl., ¶ 7.

<u>Comments To Other Patients About Atterbury</u>: The parties dispute whether a staff member once told Atterbury's fellow patients that they could not go to the courtyard because he had not taken his medicines.

Atterbury states that on December 3, 2007, senior psychiatric technician Livones "announced over the loudspeaker that none of the patients could go out into the courtyard and smoke because I had not taken my medication yet." Amend. Complaint, p. 4. Atterbury states that some patients yelled and accosted him for delaying their smoking time, but does not state that he was injured in any way.

Defendants dispute that Livones mentioned Atterbury by name to other patients. According to defendants, it is against hospital policy and practice to penalize patients for declining to take their medications. There was a practice in late 2007 in Atterbury's ward that all the patients had to make a decision whether to take their medicines before the ward would be released. Staff "would wait until all patients in the ward had either taken or declined to take their medications before releasing the ward to lunch or the courtyard." Stolp Decl., ¶ 8.  That would have been a standard and appropriate practice, according to program director Stolp. <u>Id.</u>  He also noted that there typically was a 2-hour window during which staff administered medications to patients and it would have been "standard and appropriate for the staff to complete this process before allowing the patients to move on to the next activity."  <u>Id</u>.  Defendant Livones denies that she ever told another patient that the ward could not use the courtyard because of Atterbury's refusal to take his medications. She states that she told another patient "that all patients in the ward would be permitted to use the courtyard once everyone reported whether they would or would not take their medications.  I did not mention Mr. Atterbury's name to Mr. Johnson when I made this statement. It is my understanding that Mr. Johnson reported what I said to Mr. Atterbury.  At the time I made

5

my statement, all but four of the patients in the ward had taken (or said they would refuse to take) their medications. . . . A few minutes later, these four patients, one of whom was Mr. Atterbury, came to the nurses' station to take their medications. Each of the four patients, including Mr. Atterbury, then took their medications. The staff then allowed the entire ward to go to the courtyard. [¶] Mr. Johnson appeared a bit impatient while waiting for the four patients to report to the nursing station, but his impatience did not appear to be directed at Mr. Atterbury." Livones Decl., ¶¶ 6-7. She did not observe any of the patients express any displeasure, threats or violence toward Atterbury or the other three patients.

## VENUE AND JURISDICTION

Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because the events or omissions giving rise to the claims occurred at NSH in Napa County, within the Northern District. This court has federal question jurisdiction over this action brought under 42 U.S.C. § 1983.

## LEGAL STANDARD FOR SUMMARY JUDGMENT

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (a fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.") The moving party bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (citations omitted.) The court's function on a summary judgment motion is not to make credibility determinations

or weigh conflicting evidence with respect to a disputed material fact.  See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).  The evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party.  See id. at 631.

On issues as to which the moving party bears the burden of proof at trial -- such as the qualified immunity defense in this case -- he must come forward with evidence which would entitle him to a directed verdict if the evidence went uncontroverted at trial.  See Houghton v. Smith, 965 F.2d 1532, 1536 (9th Cir. 1992).  He must establish the absence of a genuine issue of fact on each issue material to his affirmative defense.  Id. at 1537.  Once the moving party has come forward with this evidence, the burden shifts to the non-movant to set forth specific facts showing the existence of a genuine issue of fact on the defense.

A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence.  See Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995) (treating plaintiff's verified complaint as opposing affidavit where, even though verification not in conformity with 28 U.S.C. § 1746, plaintiff stated under penalty of perjury that contents were true and correct, and allegations were not based purely on his belief but on his personal knowledge).  The complaint and amended complaint were signed under penalty of perjury and therefore may be considered in deciding the motion for summary judgment.

## DISCUSSION

The defense of qualified immunity protects "government officials . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court set forth a two-pronged test to determine whether qualified immunity exists.  The court must consider this threshold question:  "Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional

7

right?" Id. at 201. If no constitutional right was violated if the facts were as alleged, the inquiry ends and defendants prevail. See id. If, however, "a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established. . . . 'The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.' . . . The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. at 201-02 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). Although Saucier required courts to address the questions in the particular sequence set out above, that requirement was later overruled in Pearson v. Callahan, 129 S. Ct. 808, 818 (2009), and courts now have discretion to decide which question to address first.

      Persons who have been involuntarily committed are entitled under substantive due process "to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish." Youngberg v. Romeo, 457 U.S. 307, 321-22 (1982). In Youngberg, the Court considered the rights of a mentally retarded man who was involuntarily committed to a state institution by his mother. The Court held that the patient had a constitutionally protected liberty interest to reasonably safe conditions of confinement, freedom from bodily restraints, and such minimally adequate training reasonably required by these interests. A procedurally proper civil commitment did not extinguish all substantive liberty interests under the Fourteenth Amendment. 457 U.S. at 315. In Youngberg, the state conceded that the patient had "a right to adequate food, shelter, clothing, and medical care" and the Court's task was to decide "whether liberty interests also exist in safety, freedom of movement, and training." Id. The Court easily found liberty interests in safety and freedom of movement, but found "more troubling" the claim of a liberty interest in habilitation, i.e., the training and development of needed skills. Id. at 316-17. The Court concluded that the patient had a protected interest in the habilitation necessary to ensure the constitutionally protected interests in safety and freedom from restraint. Id. at 319. Having found the existence of a liberty interest, the Court then

determined that it was necessary to balance the liberty of the individual and the demands of an organized society to decide whether there had been a due process violation. See id. at 320. In the context of the rights of the involuntarily committed to reasonable conditions of safety and freedom from unreasonable restraint, the Constitution only requires that the courts make certain that professional judgment in fact was exercised. Id. at 321. "[T]he decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such judgment." Id. at 323.

The Ninth Circuit has held that the professional judgment test requires a "finding of conscious indifference amounting to gross negligence" by the professional in order to impose liability. Estate of Conners by Meredith v. O'Connor, 846 F.2d 1205, 1208 (9th Cir. 1988). This standard differs from the "deliberate indifference" showing required to establish an Eighth Amendment violation because it does not require a showing of subjective awareness of the risk of harm to the patient. Neely v. Feinstein, 50 F.3d 1502, 1507 (9th Cir. 1995); see also Oregon Advocacy Center v. Mink, 322 F.3d 1101, 1120-21 (9th Cir. 2003) (rejecting argument that deliberate indifference is the degree of fault that must be established for a violation of the due process rights of a mentally incapacitated criminal defendant awaiting trial). Cf. L.W. v. Grubbs, 92 F.3d 894, 897 (9th Cir. 1996) (disapproving Neely's broad statements that gross negligence can give rise to liability for substantive due process violations, but acknowledging that the gross negligence standard may be appropriate in the limited context of the claims of inmate-plaintiffs injured because of a miscarriage of the professional judgment of a hospital official in the context of a captive plaintiff).

Defendants put forth evidence that their decisions to place and retain Atterbury in Ward T-7 were made pursuant to an exercise of their professional judgment. Defendants Cooper and Stolp, who took part in the decisions to place and retain Atterbury in Ward T-7 were program directors at the hospital who had managed patient programs at NSH for several years. Atterbury does not dispute that the defendants who took part in the transfer decision

9

1   were professionals under Youngberg, i.e., persons "competent, whether by education,
2   training or experience, to make the particular decision at issue." Id. at 323 n.30.  He
3   contends that psychology and psychiatry are fake sciences, but that alone is not enough to
4   show a triable issue of fact that the decision was not made in the exercise of professional
5   judgment.  Defendants also present undisputed evidence that the decision to put and retain
6   Atterbury in Ward T-7 was based upon a professional judgment about the psychiatric and
7   safety needs of Atterbury and other patients.  As defendants explain, Atterbury's transfer was
8   done to enhance the safety and security of the patients and staff on the two wards involved
9   and the hospital generally.  Atterbury had engaged in anti-social behavior that agitated other
10  patients.  Putting him in a ward with lower functioning patients was done to reduce his ability
11  to recruit other patients to follow his anti-social behavior, which in turn reduced the
12  likelihood of increased tension among patients. Atterbury does not identify any mental health
13  therapeutic need to stay on Ward T-4.  There is no evidence in the record from which a
14  reasonable jury could conclude that the decisions to put and keep him on Ward T-7 reflected
15  a conscious indifference amounting to gross negligence.  The evidence would allow a
16  reasonable inference that Ward T-7 was less socially enjoyable for Atterbury because the
17  patients there were lower functioning and mostly ignored him, but that does not show that
18  defendants failed to protect him.  Atterbury's assertion that he was put and kept in Ward T-7
19  for complaining about problems at the hospital is not sufficient to defeat defendants' motion
20  because the allegation of malicious motive is unsupported by any evidence in the record.  See
21  Leer v Murphy, 844 F2d 628, 633 (9th Cir 1988) (conclusory allegations insufficient to
22  defeat summary judgment).

23       The two particular incidents he identifies in his amended complaint do not raise a
24  triable issue of fact that defendants violated his constitutional rights.  Accepting Atterbury's
25  version of the facts as true for summary judgment purposes, the evidence shows that the
26  incident where another patient punched him in the face did not result in any measurable
27  injury to him and was preceded by him putting his hand up in front of the other patient who
28  tried to cut in line.  Atterbury presents no evidence that the punch by the other patient was

10

other than quite unexpected and spontaneous, and no evidence that it was the result of anything defendants did. As to the incident in which defendant Livones reportedly told other patients he was the cause of the delay in them getting released to the smoking area, Atterbury has not shown that this resulted in anything more than verbal insults by other patients. Because he has been released from NSH, there is no possibility that Livones' alleged conduct could have any future consequences for him vis-a-vis his institutional safety. In other words, his release means that any possibility of danger has now passed, and it is a certainty that no physical harm resulted to him.

Defendants have established that they did nothing intentionally or inadvertently to put Atterbury in harm's way. They have presented evidence that they transferred Atterbury to Ward T-7 and refused his requests to transfer out of that ward because they wanted to keep him and his fellow patients safer. There is no evidence that Atterbury suffered an injury during his stay in Ward T-7, let alone an injury attributable to defendants' acts or omissions. No reasonable juror could find that defendants' placement and retention of Atterbury in Ward T-7 amounted to "conscious indifference amounting to gross negligence." Neely, 50 F3d at 1508 (citation and internal quotation marks omitted). Defendants have met their burden in their motion to present evidence that would entitle them to a directed verdict if the evidence went uncontroverted at trial. The burden then shifted to Atterbury, and he has not met his burden to set forth specific facts showing the existence of a genuine issue of fact on the qualified immunity defense. Defendants are entitled to judgment as a matter of law on the qualified immunity defense.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED. (Docket # 53.) Plaintiff's motion to use ECF is GRANTED. (Docket # 63.) Judgment will be entered in defendants' favor and against plaintiff. The clerk shall close the file.

IT IS SO ORDERED.

Dated: February 23, 2010

Marilyn Hall Patel
United States District Judge

11